WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Matthew S. Barr
Jill Frizzley
Kevin Bostel

*Proposed Counsel for Debtors
and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
In re:                                              :       Chapter 11
                                                    :
**ANGELICA CORPORATION,** *et al.*,                 :       Case No. 17-10870 (JLG)
                                                    :
Debtors.[1]                                         :       **(Joint Administration Pending)**
                                                    :
------------------------------------------------------------x

**DECLARATION OF BRADLEY JORDAN IN SUPPORT OF
MOTION OF DEBTORS PURSUANT TO 11 U.S.C. §§ 105, 363,
365, 503, AND 507 AND FED. R. BANKR. P. 2002, 6004, AND 6006 FOR
APPROVAL OF: (I) (A) BIDDING PROCEDURES, (B) STALKING HORSE
ASSET PURCHASE AGREEMENT AND BID PROTECTIONS, (C) FORM
AND MANNER OF NOTICE OF AUCTION, SALE TRANSACTION,
AND SALE HEARING, AND (D) ASSUMPTION AND ASSIGNMENT
PROCEDURES; AND (II) (A) PURCHASE AGREEMENT (B) SALE
OF SUBSTANTIALLY ALL OF DEBTORS' ASSETS FREE AND
CLEAR OF LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES,
AND (C) ASSUMPTION AND ASSIGNMENT OF CERTAIN
<u>EXECUTORY CONTRACTS AND UNEXPIRED LEASES</u>**

I, Bradley Jordan, make this declaration under 28 U.S.C. § 1746:

1.      I am a Managing Director with Houlihan Lokey Capital, Inc. ("**Houlihan Lokey**"). On September 9, 2016, Houlihan Lokey was engaged to serve as investment banker to

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Clothesline Holdings, Inc. (1081); Angelica Corporation (5260); Angelica Textile Services, Inc.–NY (6508); Royal Institutional Services, Inc. (8906); and Angelica Textile Services, Inc.–CA (5010). The location of the Debtors' corporate headquarters is 1105 Lakewood Parkway, Suite 210, Alpharetta, Georgia 30009.

Angelica Corporation and its affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"). I submit this declaration in support of the Motion of Debtors Pursuant to 11 U.S.C. §§ 105, 363, 365, 503, and 507 and Fed. R. Bankr. P. 2002, 6004, and 6006 for Approval of: (I) (A) Bidding Procedures, (B) Bid Protections, (C) Form and Manner of Notice of Auction, Sale Transaction, and Sale Hearing, and (D) Assumption and Assignment Procedures; and (II) (A) Purchase Agreement, (B) Sale of Substantially All of Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, and (C) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, filed contemporaneously herewith (the "**Motion**").[2]

## Qualifications

2. I am a senior member of Houlihan Lokey's Financial Restructuring Group. Houlihan Lokey is a publicly traded (NYSE:HLI), internationally recognized investment banking and financial advisory firm, with 24 offices worldwide and more than 1,000 professionals. Houlihan Lokey's Financial Restructuring Group, which has more than 170 professionals, is one of the leading advisors and investment bankers to debtors, unsecured and secured creditors, acquirers, and other parties-in-interest involved with special situations and companies both in and outside of bankruptcy.

3. I hold a B.B.A. with distinction from the University of Michigan and an MBA with distinction from the Darden School of Business at the University of Virginia. My business address is 245 Park Avenue, 32nd Floor, New York, New York 10167. I joined Houlihan in 1998 and I have extensive experience with chapter 11 cases and other distressed

---

[2] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Motion.

restructurings, having advised debtors, creditors' committees and other constituencies for approximately 13 years.

4. I have been involved as an advisor in a wide range of special situation transactions throughout my career, involving both out-of-court transactions and chapter 11 cases, including Arcapita Bank B.S.C. (Bahrain), Atkins International, the Boyds Collection, Centro Properties Group (Australia), Deep Ocean Group AS (Norway), Greatwide Logistics, Hancock Fabrics, Intrawest ULC (Canada), J.L. French Automotive, Lehman Brothers, Inc., Neenah Foundry Co., Nellson Nutraceutical, Noranda Aluminum, Quebecor World, Inc. (Canada), Tekni-Plex, Inc., Tower Automotive, Inc., and Trico Marine Services.

5. I have been one of the principal senior engagement personnel working on Houlihan Lokey's engagement with the Debtors since September 9, 2016. In connection with the marketing and sale process and the Stalking Horse APA, I, along with Houlihan Lokey's engagement team, participated directly in discussions, due diligence, and negotiations alongside the Debtors' senior management, outside counsel, and other advisors.

6. Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge of the Debtors' operations and finances, personal knowledge gleaned during the course of my engagement with the Debtors, my discussions with the Debtors' senior management or members of the Houlihan Lokey engagement team or the Debtors' other advisors, my review of relevant documents, or my opinion based upon experience, knowledge, and information concerning the Debtors' operations and financial affairs. I am authorized to submit this Declaration.

7. If called upon to testify, I could and would testify competently to the facts set forth herein.

3

**Marketing and Sale Process**

8.  In September 2016, Angelica engaged Houlihan Lokey to serve as their investment banker to, among other things, market and sell substantially all of Angelica's assets as a going concern to meet their goals of maximizing value and preserving as many jobs as possible. Houlihan Lokey and Angelica's board (the "**Board**") and management, assessed and discussed potential sale options that included transactions whereby all or substantially all of Angelica's assets would be sold to a buyer who would continue to operate the entirety of Angelica's business, as well as an alternative whereby multiple transactions could be pursued to try to sell individual plants or regions to multiple purchasers in piecemeal fashion. At the outset of the marketing process, Houlihan Lokey advised Angelica and its Board that a whole-company sale transaction to one purchaser was more likely to be value-maximizing for the Debtors, but that other alternatives would be considered throughout the process as well.

9.  To implement this strategy, Angelica and Houlihan Lokey identified a broad array of strategic buyers (*i.e.*, companies already operating in the healthcare linen management and laundry services industry) that could have an interest and ability to consummate an acquisition on terms acceptable to Angelica. Angelica and Houlihan Lokey also identified financial buyers (such as private equity firms) that could have an interest in purchasing substantially all of the Debtors' assets, either based on the potential buyers' experience in the healthcare linen management industry, or similar industries, or based on their expertise and interest in purchasing companies facing similar operating and industry-wide challenges and opportunities.

10. In November and December 2016, Houlihan Lokey and Angelica contacted 221 potential buyers, including 42 strategic buyers and 179 financial buyers, with the aim of attracting one or more bidders for Angelica's assets. During this process, 122 interested

buyers, including 13 strategic buyers and 109 financial buyers, executed confidentiality agreements and were provided with a Confidential Information Memorandum describing Angelica's business.  In addition, many of the interested buyers submitted due diligence question lists to Houlihan Lokey and scheduled conference calls with Houlihan Lokey.  As a result of these extensive marketing efforts, Angelica received 30 indications of interest, 23 for substantially all of Angelica's assets and seven for specific laundry plants/regions.

11.    In evaluating the proposals, Angelica and Houlihan Lokey analyzed, among other things: (i) the consideration offered by each potential buyer; (ii) assets to be acquired, liabilities to be assumed, and proposed treatment of and effect on Angelica's labor agreements and related obligations, and (iii) execution risk.

12.    Of the initial list of interested buyers, Angelica selected 14 bidders to participate in a second and final round of bidding.  During this round, which lasted from mid-December 2016 until late January 2017, Angelica provided these bidders with management presentations and access to an electronic data room (the "**Data Room**") containing significant additional diligence and other confidential information about all of Angelica's business, and invited parties to conduct on-site visits of Angelica's headquarters and laundry plants.  Over the course of these on-site visits, Houlihan Lokey and Angelica continued negotiating with various bidders to increase the value of the bids received.

13.    After the completion of the second and final round of bidding, Angelica received four final bids for substantially all of Angelica's assets.  Angelica, its Board, and its advisors conducted a comprehensive review of the final bids and continued negotiations with these bidders in order to determine the optimal path forward.  To that end, Angelica and its Board, with the assistance of its advisors, were able to narrow down the four final bids to one bid

5

that presented the most value-maximizing proposal at that time (the "**Top Final Round Bidder**"). To complete its final diligence, however, the Top Final Round Bidder requested that Angelica grant it exclusivity and thereby cease discussions with all other known or potential bidders.

14. Upon Angelica's receipt of the Top Final Round Bidder's request for exclusivity, KKR Credit Advisors (US) LLC, on behalf of certain of its affiliates and managed funds and accounts ("**KKR Credit**"), a lender under the Term Loan Credit Agreement, who had monitored the marketing and sale in accordance with its rights thereunder, completed its own review of the final bids and, through its affiliate, 9W Halo Holdings L.P. ("**Halo**" and, together with KKR Credit, "**KKR**"), submitted a higher cash bid that also included a credit bid component on account of a portion of KKR's prepetition debt. On February 1, 2017, KKR submitted a formal letter of intent for the purchase of substantially all of Angelica's assets. Angelica and its Board analyzed this proposal and, given the significant additional value offered, among other things, elected to sign KKR's letter of intent on a non-exclusive basis and deny the Top Final Round Bidder's request for exclusivity, and moved to complete outstanding diligence requests and negotiate sale documents with KKR.

15. After extensive deliberations, significant negotiations with KKR, and multiple rounds of revisions to the terms of the bid, Angelica and its Board concluded that they had received the best possible bid for the Purchased Assets as a going concern that would maximize value for all of Angelica's stakeholders. As a result, the Board selected Halo to be the stalking horse bidder (the "**Stalking Horse Bidder**") and Angelica executed a stalking horse asset purchase agreement with the Stalking Horse Bidder (the "**Stalking Horse APA**") on April 3, 2017.

6

16. Halo, a Delaware limited partnership, is managed by a subsidiary of KKR Credit Advisors (US) LLC, a registered investment adviser and an affiliate of KKR & Co. L.P. KKR & Co. L.P. is a global investment firm that manages investments across multiple asset classes, including private equity, energy, infrastructure, real estate, credit strategies, and hedge funds.

17. The marketing process for Angelica's assets was comprehensive and included a wide variety of potential strategic and financial investors. During the postpetition period, Houlihan Lokey will continue to market Angelica's assets by (i) engaging both strategic and financial buyers that may have an interest in bidding for substantially all of Angelica's assets, (ii) providing access to the Data Room upon an interested parties' execution of a confidentiality agreement (and meeting certain other requirements set forth in the Stalking Horse APA), and (iii) providing additional information to potential purchasers upon request (provided that the Debtors' believe such requests are reasonable and appropriate under the circumstances).

18. Proceeding with a postpetition marketing and competitive bidding and auction process will ensure that the highest or best bid is obtained for Angelica's assets. The goal of the process is to have new or existing bidders submit offers for substantially all of Angelica's assets in accordance with the Bidding Procedures in an effort to obtain the maximum value for Angelica's assets, maximize the value of Angelica's estates, and preserve as many jobs as possible.

19. The goal of the postpetition marketing and competitive bidding and auction process is to have new or existing bidders submit offers for substantially all of Angelica's assets in accordance with the Bidding Procedures. Such a process is the best option available to generate the greatest level of interest in purchasing the assets resulting in Angelica

7

obtaining the highest or best bid available, and thus the maximum value, for its assets as a going concern, which will in turn maximize the value of Angelica's estates and preserve as many jobs as possible. To the extent there are potential investors interested in only a subset of the Debtors' properties, Houlihan Lokey will encourage and assist those purchasers in identifying partners so that they may collectively propose a transaction with aggregate value in excess of the Stalking Horse Bid.

## Stalking Horse APA

20. Under the Stalking Horse APA, the Purchaser will acquire substantially all of the Debtors' assets (the "**Purchased Assets**"), other than the Excluded Assets, on a going concern basis. The consideration offered by the Stalking Horse Bidder is estimated at approximately $125 million, including (i) $17.4 million in the form of a credit bid for a portion of KKR's prepetition debt and (ii) cash and cash consideration, plus the assumption of certain liabilities, subject to certain adjustments and subject to a higher or otherwise better offer. The cash consideration includes an amount sufficient to satisfy, among other things, (i) all obligations (a) secured by liens on the Purchased Assets that are senior to those held by KKR and (b) senior to KKR in payment priority, pursuant to that certain Agreement Among Lenders, dated as of July 12, 2016, and (ii) the Closing Cash Shortfall (as defined in the Stalking Horse APA), which consists of cash provided by the Stalking Horse Bidder, up to a capped amount, that is needed to cover certain costs associated with the wind-down of the Debtors' bankruptcy estates after consummation of the Sale Transaction. Through the Stalking Horse APA, thousands of the Debtors' employees will have the ability to keep their jobs on substantially similar terms and conditions under which they are currently employed.

WEIL:\96025206\7\15465.0003

21. The Stalking Horse APA constitutes the best offer available for the Purchased Assets at this time. It is my opinion that subjecting the Stalking Horse Bid to the competitive bidding and auction process established by the Bidding Procedures will enable the Debtors to realize the highest and best value available for the Purchased Assets.

### Need for Expeditious Sale Process

22. Any delay in the sale of the Purchased Assets could result in further deterioration and ultimate loss of the Debtors' going concern value, which could result in the loss of jobs for most, if not all, of the Debtors' employees. In contrast, approval of the proposed Bidding Procedures will enable the Debtors to conduct an efficient process to realize their going concern value, maximize recoveries for the Debtors' stakeholders, and preserve jobs. For these reasons, the Debtors have determined that a sale, conducted in accordance with the Bidding Procedures, is in the best interests of the Debtors' estates.

23. Further, the Stalking Horse APA and the Debtors' DIP Facility impose strict milestones on the Debtors to accomplish various objectives in a prompt and timely manner, including milestones and termination events tied to the relief sought in the Motion as follows:

(a) Stalking Horse APA:

(i) The Stalking Horse APA may be terminated by Purchaser if the Bidding Procedures Order is not entered within 30 days following the Commencement Date; and

(ii) The Stalking Horse APA may be terminated by Purchaser if the Sale Order is not entered within 60 days after the Bidding Procedures Order is entered by the Bankruptcy Court.

(b) DIP Facility:

(i) On or before seven Business Days after the Commencement Date, the Debtors shall have filed the Motion with the Bankruptcy Court with the Stalking Horse Bid.

9

    (ii)    The Debtors shall have obtained the Bankruptcy Court's approval of the Stalking Horse Bid no later than 25 days after the Commencement Date.

    (iii)    The Auction shall be held no later than 70 days after the Commencement Date; and

    (iv)    The Bankruptcy Court shall grant the Motion no later than 75 days after the Commencement Date, and the closing of the Sale Transaction must occur no later than 85 days after the Commencement Date.

24. The Debtors believe that the proposed timeline in the Bidding Procedures provides them with the longest possible marketing period that complies with the milestones and termination events set forth in each of the Stalking Horse APA and DIP Facility, while preserving due process considerations in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules.

25. In addition, absent the sale process contemplated by the Motion, the Debtors will be unable to realize the maximum value of the Purchased Assets for the benefit of all stakeholders. Based upon my review of the Debtors' operations and finances, I have concluded that the Debtors' revenues are insufficient to support the continued operation of the Purchased Assets in light of the capital investments that are required to maintain competiveness and the debt service required by the Debtors' existing capital structure. Thus, a prompt sale of the Purchased Assets is necessary to ensure that such assets are sold at their going concern value prior to further deterioration in revenues and profitability, and loss of liquidity necessary to operate the Debtors' business.

**Bid Protections and Bidding Procedures**

26. The Bidding Procedures and the Stalking Horse APA contain certain bid protections, including an initial overbid requirement and subsequent bid increments and the Expense Reimbursement (collectively, the "**Bid Protections**"). The Bid Protections were

heavily negotiated by the Stalking Horse Bidder and the Debtors and their respective advisors at arms' length and in good faith and were necessary to secure the Stalking Horse Bidder's commitment to purchase the Purchased Assets. The Bid Protections, collectively and individually, are fair and reasonable, will not chill bidding, and will enable the Debtors to maximize value through a sale process.

27. The Expense Reimbursement includes the Stalking Horse Bidder's reasonable and documented expenses up to an aggregate amount of $750,000. The Expense Reimbursement is payable as an administrative expense, subject to the terms and conditions of the Stalking Horse APA.

28. The Expense Reimbursement, which was a material inducement for the Stalking Horse Bidder to make a binding bid that will serve as a floor price at any auction, is: (i) commensurate to the real and substantial benefit conferred upon the Debtors' estates by the Stalking Horse Bidder; and (ii) fair, reasonable, and appropriate in light of the size and nature of the proposed sale and the efforts that have been and will be expended by the Stalking Horse Bidder.

I declare under penalty of perjury that the foregoing is true and correct. Executed on April 3, 2017, in New York, New York.

/s/ Bradley Jordan
Bradley Jordan